In the Matter of Mary
SELBY, Appellant,

v.

NORTH CALLAWAY BOARD OF
EDUCATION, Respondent.

No. WD 41470.

Missouri Court of Appeals,
Western District.

Sept. 5, 1989.

Janice A. Harder, Hindman, Scott &
Goldstein, Columbia, John W. Inglish, Jefferson City, for appellant.

Louis J. Leonatti, G. Andy Runge, Ann
P. Hagan, Mexico, for respondent.

Before CLARK, P.J., and
LOWENSTEIN and BERREY, JJ.

LOWENSTEIN, Judge.

As a school counselor, the appellant
Mary Selby qualified as a tenured permanent teacher for the respondent school
board. Her duties involved special testing,
posting of students' grades, career planning, plus vocational and curriculum counseling. After a hearing she was terminated by North Callaway under the provisions
of §§ 168.104–168.130, RSMo.1986, known
as the Teacher Tenure Act. All further
statutory references are to the Revised
Statutes of Missouri 1986. Section 168.114
states an indefinite contract with a permanent teacher shall not be terminated except
for one or more specifically enumerated
causes. Section 168.116 sets out the actual
procedure for termination beginning with a
warning to the teacher by the board and

ending with a hearing. The board's grounds for Selby's termination were incompetence and inefficiency. Section 168.-114.1.(3). The Circuit Court of Callaway County entered judgment for the board.

Although Selby raises several points on appeal, disposition of the case pivots on compliance with the statutory termination scheme and its procedure as set out in § 168.116, *supra*. *Adkins v. Hazelwood School District*, 743 S.W.2d 869, 871 (Mo.App.1987); *Iven v. Hazelwood School District*, 710 S.W.2d 462 (Mo.App.1986), held the statutory method for termination of a tenured teacher on grounds of inefficiency or incompetence is a three step process:

1. Under § 168.116.2 a written warning must be given the teacher by the school board, "stating specifically the causes which, if not removed, may result in changes." Section 168.116.1. This is referred to as the "warning letter."

2. The next step is the superintendent or a designated representative must "meet and confer with the teacher, in an effort to resolve the matter." Section 168.116.2. The teacher is to be given at least 30 days during this period to remedy the deficiencies noted in the warning letter. *Id.* *Hanlon v. Board of Education of Parkway School District*, 695 S.W.2d 930, 932 (Mo.App.1985). This 30 day period can be expanded, and will be referred to as the "curative period." "The purpose of § 168.116.2 is to give the teacher an opportunity to know exactly what the complaints against him are and afford him an opportunity to cure the situation before charges are brought." *Adkins, supra*, at 872.

3. If necessary, the third step is the service of written charges specific as to the grounds for termination together with a notice of the hearing. Section 168.116.1 and 168.116.3. This "charging letter" is also commonly referred to as the "termination letter." The actual charges contained in the termination letter and then tried at the hearing "must relate to the scope of the warning and subsequent meeting. Otherwise the in-

tent of the legislature to provide substantive and procedural safeguards would not be honored." *Smith v. Normandy School District*, 734 S.W.2d 943, 947 (Mo.App.1987).

The overriding purpose of the Teacher Tenure Act is to "attain stability, certainty and permanence of employment on the part of those who have shown by educational attainment and by a probationary period their fitness for the important profession of teaching[,]" *Lopez v. Vance*, 509 S.W.2d 197, 202 (Mo.App.1974), and "to protect [these] teachers in the security of their positions." *Hirbe v. Hazelwood School District*, 532 S.W.2d 848, 850 (Mo.App. 1975). The safeguards enacted to obtain this purpose are set forth with specificity in § 168.116. If as here the charges brought by the board against the teacher involve incompetence, inefficiency or insubordination, at least 30 days before service of notice of these charges, the teacher shall be given a "warning in writing, stating specifically the causes which, *if not removed*, may result in charges. Thereafter, both the superintendent, or his designated representative, and the teacher shall meet and confer in an effort to resolve the matter." Section 168.116.2 (emphasis added). The purpose of this additional safeguard is to guarantee the teacher an opportunity to know exactly what the complaints are against him or her and to afford him or her a chance to cure the situation before charges are brought. *Artherton v. Board of Education of School District of St. Joseph*, 744 S.W.2d 518, 521 (Mo.App.1988), *Adkins v. Hazelwood School, supra*, at 872; *Iven v. Hazelwood School, supra*, at 464; *Rainwater v. Board of Education of Greenville*, 645 S.W.2d 172, 175 (Mo.App. 1982); *Rafael v. Meramec Valley R–III Board of Education*, 569 S.W.2d 309, 312 and 315 (Mo.App.1978); *Blue Springs Reorganized School District IV v. Landuyt*, 499 S.W.2d 33, 36 (Mo.App.1973). This element has risen to the level of a "required good faith effort to give the teacher a chance to remedy defects." *Iven v. Hazelwood School, supra*, at 465; *Blue Springs Reorganized School, supra*, at 37.

On February 26, 1988, the District Superintendent, Dr. Tom Gerling, delivered to Selby a warning letter informing her of deficiencies in her job performance and stating that if these deficiencies were not corrected her employment could be terminated. He informed Ms. Selby he had appointed Mr. Keith Willis, the high school principal, as his designee to work with her on correcting her deficiencies. At Selby's request, a meeting was held on March 11, 1988, with Gerling and Willis so that they could confer about the deficiencies and matters set forth in the warning letter. On April 13, 1988, a letter was given to Selby informing her of the district's intention to terminate her permanent teacher's employment contract, notifying her that a hearing would be held on May 12, 1988. A public hearing was held on May 12, 1988, and May 23, 1988, with both sides presenting evidence. Finally, on June 7, 1988, the board informed Selby that her teaching position was terminated. More facts will be given *infra* as needed.

In reviewing this administrative decision, this court is to consider all competent evidence before the board; however, the inquiry is limited. *Rafael v. Meramec Valley, supra*, at 314.

> The reviewing court may only determine whether the board could reasonably have made its findings and reached its result or whether the decision was clearly contrary to the overwhelming weight of the evidence. The court may not substitute its judgment on the evidence and may not set aside the board's decision unless it is not supported by competent and substantial evidence on the whole record. In addition, the evidence must be considered in a light most favorable to the board's decision, together with all reasonable inferences which support it.

*Ortbals v. Special School District*, 762 S.W.2d 437, 439 (Mo.App.1988).

As discussed *supra*, the purpose of the warning letter and the minimum 30 day period thereafter, is to allow the teacher an opportunity to realize his or her deficiencies and to give the teacher the chance to cure or correct these deficiencies. *Rafael, supra*, at 315. The crucial period in any proceeding terminating a tenured teacher due to incompetency, inefficiency or insubordination is the period beginning with the warning letter and ending with the written charges. *Rainwater v. Board of Education of Greenville, supra*, at 176–77; *Rafael v. Meramec Valley R–III Board of Education, supra*, at 309, 315; *Pollard v. Board of Education Reorganized School District Etc.*, 533 S.W.2d 667, 670 (Mo.App. 1976); *Blue Springs Reorganized School, supra*, at 39. There must be competent and substantial evidence brought forth at the hearing showing continued incompetence, inefficiency or insubordination during the crucial period of the same type set forth in the warning letter. *Rainwater, supra; Rafael, supra*. If this were not true a school board could undermine the effectiveness and purpose of the 30 day curative period by simply restating the contents of the warning letter in the termination letter, and then terminate the teacher's contract forthwith, regardless of what occurred in the curative stage. In all practical terms, this is exactly what happened in the case at bar. This procedure flies in the face of the legislative scheme as "the statute would have provided that the hearing, if held, would be on the causes related in the warning letter," and the charging letter would therefore be superfluous. *Rafael*, 569 S.W.2d at 313. *Pollard, supra*, dealt with actual content in the warning letter. There the court noted that without specific examples of how to "improve teaching qualities" the person risked termination after the 30 day period which would defeat the purpose of the ... improvement period." 533 S.W.2d 670; *Dameron v. Board of Education of Lebanon School District*, 549 S.W.2d 671, 675–76 (Mo.App. 1977). The adherence to and allowance of a curative period is as an essential element to terminate as any other procedural elements mentioned *supra*.

Turning to the record here, the findings of fact of the School Board are verbatim to the language it used in both the warning and termination letters. The fact the past acts giving rise to the warning are the only ones in the termination letter and findings

raises the specter of the termination having been based on past acts of incompetence and inefficiency with no effort given to curing job deficiencies. As can be seen from the following excerpts of the board's complaints, many of Selby's actions either could not have been cured, or were already cured before the submission of the warning letter of February 26, 1988:

1) Selby sent a letter dated February 26, 1987, to FFA Alumni members of North Callaway High School which contained false statements and accusations. She received a letter of reprimand for this from the school board, which she accepted.

2) Selby sent in a requisition for PSAT exam materials in the amount of $94.00. However, $220.50 was required for an adequate quantity of materials to be supplied. An additional requisition had to be prepared in order to obtain the test.

3) Selby did not submit requisitions for Future Teachers of America Fund Raisers before ordering candy bars from the manufacturer in violation of North Callaway R–1 School Board policy. This resulted in overcharges. Then, two requisitions were submitted for the same transaction, which could have resulted in double payment of some twenty-five cases of candy bars.

4) On January 24, 1987, Selby, without obtaining the district's approval, made a reservation to attend a conference after having been specifically informed that she could not encumber any district funds without obtaining the prior approval of the North Callaway Board of Education.

5) Selby is responsible for all testing which takes place at the North Callaway High School. On February 4, 1987, she delivered to the high school principal's office a list of students desiring to take the ASVAB test. This list included fictional names which when read rapidly together, constituted obscene and derogatory statements. These names were placed in a bulletin that was read throughout the school.

6) Selby improperly advised Mrs. Jenny Bruns and her son, Sean, that he could substitute six units of Ag courses for two units of science. In fact, this could not be done, and if others had not corrected Sean Bruns' schedule, he would not have achieved enough credits to graduate from North Callaway High School.

7) On January 5, 1988, the files of twenty-one students either currently enrolled, dropped from enrollment or recently graduated were found in Selby's office. The files should have been in file cabinets in the principal's office.

8) On January 5, 1988, at 3:20 p.m. a new student named Stephanie Rodenbaugh was sent to Selby's office to be enrolled in the North Callaway R–I High School. It is Selby's duty to consult with students, complete the student's schedule and to make necessary entries for that student's cumulative school record. Selby was also to request the transferred school records from the school where the student was previously enrolled. Instead of conferring with the student, Selby sent her back to the principal's office with a message that she could not accommodate the student because she had to go to a meeting. The only meeting for which she was scheduled with the office on that date was a 7:00 p.m. meeting at the Williamsburg Elementary School for the purpose of registering eighth grade students. The principal of the high school had not been informed of any other meeting that Selby was to attend.

9) On January 5, 1988, Selby met with Mrs. Nancy Seelow, secretary to the principal of the North Callaway High School. Selby questioned Ms. Seelow concerning Selby's work and tape recorded this conversation without Ms. Seelow's consent or knowledge.

A second type of conduct which can be found in the warning letter, termination letter, and the findings of fact is of a type which, if supported by substantial evidence, could have been a basis for termination. The school board would have the burden of proving that, during the crucial curative period, Selby remained incompetent, inefficient or insubordinate by failing to cure those deficiencies set forth in the warning letter. *Tonkin v. Jackson County Merit System Com'n.*, 599 S.W.2d 25, 31–32 (Mo.

App.1980). However, in the present case, the board has failed to meet this burden. As to the instances of misconduct, *infra*, the findings of fact of the school board are completely void of any evidence concerning whether Selby did not cure the deficiencies during the crucial period. *Ortbals v. Special School, supra*, at 439. Without such a showing, the decision of the board must fail under the scope of review set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The list of such items is as follows:

1) Selby failed to compute grade point averages for North Callaway students, even though she had been directed to do this by the principal of the high school. Selby admits that she was asked to accomplish this task; however, after completing two or three files, she left the office leaving the computations to be concluded by either Ms. Seelow or Mr. Graham.

2) John Castle made frequent inquiries to the school and requested for more than a month that his records be sent to the University of Missouri–Columbia in order that he made the January deadline for enrollment. As of January 5, 1988, these records had not been sent. Mr. Castle's records were required to support his enrollment at the University of Missouri–Columbia and Selby failed to transfer them promptly per his request.

3) On January 6, 1988, officials at Hickman High School, Columbia, Missouri, contacted Selby and asked about the records of Tonya Smithia which should have been sent when she left North Callaway High School. Tonya Smithia left North Callaway on November 19, 1987, and as of January 6, 1988, her records had not been sent to Hickman High School.

4) On January 7, 1988, Selby was questioned as to whether she had, in accordance with her assigned duties, checked the record of seniors to determine who had sufficient credits and whether they were in courses which they needed to graduate. Selby responded that she had not completed this work.

5) On January 15, 1988, the school district was advised by the mother of Shelby Krueger that the Missouri Protection Agency for Special Education in Jefferson City had not as yet received Shelby Krueger's records. These were required before the agency could complete its work. The transfer of these records is part of Selby's duties and responsibilities and requests for transfers of these records had been made in December, 1987, and on January 15, 1988. Mrs. Krueger was contacted on February 5, 1988, and it was determined that Selby still had not forwarded the records.

6) On January 21, 1988, Mrs. Betty Haden, an English and Spanish instructor at North Callaway High School, contacted the principal's office concerning the third quarter grades for Vicki Rubel and Tonya Bond, who were new students at the high school. It was Selby's responsibility to obtain grades from the transferring school of these students. When the office requested Selby to provide the necessary information to Ms. Haden, Selby responded that she had the information but that she was too busy to get it.

7) Selby failed to improve her performance by January 30, 1988, in those areas outlined by Mr. Willis in the Job Targets, Guidelines and evaluation sheet presented to her on November 4, 1987.

The preceding list does state instances where the board could terminate a permanent teacher's contract if all procedures of § 168.116 had been faithfully followed. Here, the board's fatal error was a failure to include in its findings of fact evidence of incompetency, inefficiency or insubordination during the curative period between February 26, 1988, and April 13, 1988. *Ortbals v. Special School, supra*, at 439. Even giving the board the benefit of the doubt, a perusal of the termination hearing transcript uncovered but three instances of possible misconduct relating to the warning letter.

The first concerns a letter from Mundy's Mill Junior High School in Jonesboro, Georgia, received by Mr. Willis on March 22, 1988. This date falls within the curative period between the warning and charging letters. The letter stated the school had requested records for Krystal Ann Allen on

January 4, 1988, and on January 14, 1988, but had not yet received them. It was Selby's responsibility to honor such requests. The significance of this letter stems from the fact that the warning letter given to Selby makes direct reference to her incompetence in handling requests for student files, evidencing that Selby had not cured this type of deficiency during the crucial period.

A second instance of misconduct during the curative period came when Willis stated that on March 9, 1988, he inspected the files in Selby's office and found them in a disorderly fashion. This could tend to show Selby's continued incompetence in her administration of student files, a deficiency which was alluded to in the warning letter.

■ The third and final possible instance of misconduct concerns the "Job Target" evaluations. At the termination hearing there was a "Summative Evaluation Report" marked as Superintendent's Exhibit # 13, dated April 7, 1988, and signed by Selby and Mr. Willis on April 11, 1988. This time slot falls within the period to cure. Willis wrote that "Mrs. Selby has not accomplished the five job targets that were established. She does not fulfill the job requirements that are given to her." This evaluation would be important to show that Selby had not cured deficiencies relating to the Job Targets which had been referred to in the warning letter. However, during the termination hearing Mr. Willis stated that this evaluation of April 7 was a "summative evaluation ... a *culmination* of all the *previous evaluations....*" (Emphasis added.) Therefore, the court would have no way to determine whether this evaluation included activities which took place during the curative stage, making this evidence incompetent as to showing a lack of cure.

■ Assuming only for the sake of argument that the above three instances were included in the board's findings of fact, there would still be doubt as to whether these instances would have constituted substantial evidence to uphold the decision. Even though the board is not required to find each and every charge to support an order of termination[,] *Smith v. Normandy School District,* 734 S.W.2d 943, 948 (Mo.App.1987), merely stating a few specific instances of misconduct coupled with an inconclusive summary evaluation covering a forty-six day period could hardly be considered substantial.

The findings of the board in terminating Selby refer only to the incidents and specifics contained in the warning letter and repeated verbatim in the termination letter. No findings were made on any evidence received at the hearing which pertained to Selby's failure to cure any job deficiencies during the period from the warning letter of February 26, 1988, through the April 13, 1988 termination letter. The findings only show principal Keith Willis was assigned to work with Selby on curing the deficiencies. The conclusions merely state the deficiencies enumerated in the warning letter were not resolved.

In sum, there was no evidence nor findings of a chance to and subsequent failure to correct deficiencies during the curative period, so the conclusion of failure to cure is unsupported by any evidence. The necessity and importance of a failure to rectify in the curative period is a procedural safeguard for tenured teachers. It rises to the level of a necessary element to support the ultimate decision to terminate, and without any competent and substantial evidence to support the decision and judgment of an essential element, the board's ruling must fail under the scope of review prescribed under *Murphy v. Carron, supra,* at 32; *Harrod v. Board of Education, City of St. Louis,* 500 S.W.2d 1 (Mo.App. 1973).

The judgment of the circuit court is reversed and remanded with directions to enter judgment reinstating Selby as a permanent teacher. *Pollard v. Board of Education Reorganized School, supra,* at 671. The trial court may also determine if Selby during this appeal has lost any salary following the board's decision of June 7, 1988, and, if so, pursuant to § 168.116.4 and § 168.120.4, render judgment for her for damages subject to the doctrine of mitigation as set forth in *Wolf v. Missouri State*

*Training School for Boys*, 517 S.W.2d 138 (Mo. banc 1974). *See Stewart v. Board of Education of Ritenour Consolidated School District, R–3*, 630 S.W.2d 130 (Mo. App.1982); *Carter County School District v. Palmer*, 582 S.W.2d 347, 350 (Mo.App. 1979).

All concur.